**EDGE IMPORT CORP., Plaintiff,**

v.

**UNITED STATES, Defendant.**

**C.D. 4832;  Court No. 75–8–02155.**

United States Customs Court.

Dec. 17, 1979.

Greenwald, Kovner & Goldsmith, New York City (Frank J. Hariton, New York City, at the trial; Leo Goldsmith, Jr., New York City, on the briefs), for plaintiff.

Alice Daniel, Acting Asst. Atty. Gen., Washington, D. C., Joseph I. Liebman, Attorney in Charge, Field Office for Customs Litigation, New York City (Susan Handler-Menahem, Hackensack, N. J., at the trial and on the brief), for defendant.

LANDIS, Judge:

This case involves the importation of hunting knives exported from Germany and entered at New York in 1973 and 1974. The prior opinion of this Court, C.R.D. 79–7, denying defendant's motion to strike portions of plaintiff's brief, appears in 82 Cust.Ct. ——.

The Customs Service heretofore classified the imported knives under TSUS item 650.-21, as modified by T.D. 68–9, and assessed duty thereon at the rate of 0.5 cent each plus 8.5 per centum ad valorem. Plaintiff in its complaint claims that those knives which contain stag horn in their handles are properly classifiable under TSUS item 650.-13, as modified by T.D. 68–9, and dutiable at the rate of 2 cents each plus 6 per centum ad valorem. Plaintiff further claims that those knives which contain wood in their handles are properly classifiable under TSUS item 650.19, as modified by T.D. 68–9, and dutiable at the rate of 1 cent each plus 6 per centum ad valorem. Finally, plaintiff alternatively claims that prior Customs practice requires a result in its favor.

For the reasons stated below, it is the determination of the Court that the classification relied upon by the defendant shall prevail.

The pertinent provisions of the tariff schedules as modified by T.D. 68–9, are as follows:

SCHEDULE 6. – METALS AND METAL PRODUCTS
Part 3. – Metal Products

\* \* \* \* \* \*

Subpart E. – Tools, Cutlery, Forks and Spoons

\* \* \* \* \* \*

Knives not specifically provided for elsewhere in this subpart, and cleavers, with or without their handles:

\* \* \* \* \* \*

Knives with their handles:

\* \* \* \* \* \*

| 650.13 | With animal horn, bone, ivory, mother-of-pearl, or shell handles . . . . . . . . . . . . . . . . . . . . . 2¢ each + 6% ad val. |

\* \* \* \* \* \*

Other:
| 650.19 | Hunting knives with wood handles . . . . . . . . . . . . . . 1¢ each + 6% ad val. |
| 650.21 | Other . . . . . . . . . . . . . . . . 0.5¢ each + 8.5% ad val. |

In this case there is the question of whether a knife, containing a *metal* guard and *metal* pommel may be classified as a stag-handled knife or a wood-handled knife. This raises the issue of whether a guard and pommel are part of the handle of a knife. (The guard of a knife is that horizontal piece which separates the blade from the remainder of the handle. The pommel is at the very end of the knife. The guard is largely a safety feature while the pommel has esthetic value and also occasionally holds the knife together.) A subsidiary question plaintiff has made reference to is whether prior classification by the Customs Service bars the classification made herein.

Two witnesses were offered by plaintiff and one by defendant. Plaintiff's witnesses, however, were ineffective and not particularly persuasive.

Plaintiff's first witness was Mr. Tom Palmer, who for seven years was Vice President of Gutman Cutlery Company (the parent of plaintiff). He was involved in sales and purchasing for the company with "special emphasis on product design." (R. 4.)

Mr. Palmer stated he agreed with Webster's Seventh New Collegiate Dictionary's definition of handle—"a part that is designed to be grasped by the hand." (R. 8.) Mr. Palmer further stated, in the major portion of his testimony, that in the knife trade the exhibits in the case would be known as stag-handled or wood-handled knives. (*See*, e. g., R. 7, 23.) This was because the portion that was held was either wood or stag. However, on cross-examination, counsel for the defendant brought out that Palmer, while demonstrating how a knife is held, also had his hand, more particularly his thumb, wrapped around the metal guard as well. (R. 49–50.) Thus the guard would appear to be a segment of the handle. Nevertheless, Palmer stated that manufacturers, distributors and consumers, referred to the importations as stag-handled or wood-handled knives. This opinion was largely endorsed by numerous knife catalogues introduced by the plaintiff. However, even if the imported merchandise

is known in the trade as wood-handled or stag-handled knives, this is not necessarily determinative of its tariff classification. *United States v. Ignaz Strauss & Co., Inc.,* 37 CCPA 32, 35, C.A.D. 415 (1949). *See also Hancock Gross, Inc. v. United States,* 383 F.Supp. 832, 73 Cust.Ct. 72, C.D. 4555 (1974), *aff'd,* 517 F.2d 951, 62 CCPA 100, C.A.D. 1153 (1975).

Plaintiff's second witness was Mr. Ivan Szanto, the general manager of Gutman Cutlery (parent of plaintiff). Mr. Szanto testified that while he could imagine a knife with no metal whatsoever from the end of the blade to the end of the knife, such a knife would not be a quality knife. (R. 65.) Furthermore, he never saw a guard made out of wood, although he conceded that such a construction may not be impossible. (R. 66.) Finally, "the pommel is always made out of metal." (R. 67.) On cross-examination though, Mr. Szanto identified high quality knives, marked hunting knives (catalogue, Exhibit A), which contain wood in their handles and have no guards or pommels of metal. In another catalogue exhibit (Exhibit C, Gutman's own cutlery) proffered by the defendant, the witness, however, identified a knife with a stag handle which has no metal guard or pommel. (R. 79.) Thus, such a knife is clearly possible.

Apparently in an effort to introduce a *de minimis* argument i. e. that the metal in a knife pommel and guard is *de minimis* when compared to the handle as a whole, Szanto testified that the guard is never more than 3 percent of the value of the knife. (R. 77.) Yet doubt was cast on this figure on cross-examination. (R. 80.)

It should be noted that nowhere in the record are any of the exhibits identified as being the same as the imported merchandise. This should have been done by plaintiff, if that is true.

The defendant's witness was Mr. R. N. Farquharson, Executive Vice President and Chief Operations Officer of Case Cutlery Company. Case Cutlery manufactures pocketknives, hunting knives, scissors and shears, and markets them around the world.

(R. 84.) The company also has prepared knives for the military, and for the Space Program. (R. 85.) The company has been making knives since 1947. (R. 91.) Mr. Farquharson has been with Case since 1955. (R. 84.) As Executive Vice President and Chief Operations Officer, since 1973, Mr. Farquharson has been in charge of all the operations of the company. (R. 85.) Mr. Farquharson at the time of trial was President Emeritus of the American Cutlery Manufacturers Association after having served two years as President. He has been quoted in books and articles on knives and through the years has frequently attended trade shows. (R. 86.)

According to this experienced witness, "[a] knife is made of two major parts, the blade and the handle. The handle is composed of an assembly, normally, of three parts: The cover material, the guard and the bolster." (R. 87.) He stated: "It's not a knife without a handle and without a blade." (R. 88.) Some more of his testimony is worthwhile excerpting here:

Q. What is the purpose of the guard? —A. It's a safety feature. As you have heard testimony earlier today, to guard the individual's hand from slipping over the cutting edge.

Q. Why does a guard become necessary in a hunting knife?—A. From a safety feature, it protects the user from hurting himself.

Q. Why is there more of a likelihood in a hunting knife that a person's hand would slip?—A. Well, you are gutting an animal. Your hand gets slippery and moist and you might not be able to hold the knife firmly enough, and one puts on guards to keep your hand from sliding forward, and a guard on the end of the knife to keep it from sliding off.

Q. And both the back pommel and the guard serve to protect the hand?—A. Yes, that's why it's shaped that way. [R. 88–89.]

In other knives, where the handles are made by using washers, the pommel locks the washers in place. "[The pommel] is used to keep the whole handle together." (R. 89.)

The defendant's position in this case is that since these elements of the handle, the guard and the pommel, are made of metal, one may not refer to the completed object as a stag-handled or wood-handled knife since important segments of them are made of metal. One of plaintiff's counterarguments is that the TSUS provision for stag-handled or wood-handled knives, under such an understanding as outlined above, would be devoid of meaning since there never would be such an item as a completely stag-handled or wood-handled knife. Yet Mr. Farquharson's testimony belies this argument:

Q. Was there a time historically when guards and pommels were all made from the covering material?—A. Oh, yes. They still are in some instances. [R. 90.]

This is even supported by one of plaintiff's witnesses. See testimony under cross-examination at pages 78–79 of the record.

█ The critical point of Farquharson's testimony therefore is that a knife consisting of a metal guard and pommel cannot be classified as a stag-handled or wood-handled knife even though the knife's covering is made of those materials. That is the holding of this case.

On cross-examination, Farquharson was forced to admit, repeatedly, that various catalogues identified such knives as leather-handled knives, or stag-handled knives, despite the presence of metal guards and pommels. He was able to extricate himself, on redirect examination, by pointing out that these knives were categorized according to their cover material, for ease in marketing. This was persuasive. Plaintiff's witnesses were not as effective nor as persuasive.

The case most closely on point is *United States v. Charberjoy Distributors, Inc.*, 465 F.2d 922, 59 CCPA 207, C.A.D. 1068 (1972), which involved the importation of table knives from Japan. The handles of the merchandise were composed of stainless steel and plastic. The knives were classified as knives "with stainless steel handles" under TSUS item 927.53. Yet the Court held that since the knife handles were composed of stainless steel *and* plastic, the proper classification was under TSUS item 650.21, for "other" knives.

The Court of Customs and Patent Appeals approvingly cited the Customs Court:

With respect to identity of merchandise covered by item 927.53 classification, the evidence in this record clearly shows that the imported knives possess handles which are composed in substantial part of a non-metallic material, a plastic. Item 927.53, the temporary provision, and items 650.09 and 650.11, the permanent provisions to which item 927.53 refers, all contain the qualifying phrase "with stainless steel handles." This latter phrase we think is incompatible with a description of a knife "with stainless steel and plastic handle"—the characterization most accurately identifying the knife handles at bar, according to the evidence. And we find nothing in the tariff schedules themselves or in the Tariff Classification Study notes [footnote omitted] which indicates that the language "with stainless steel handles" is to be given any construction other than a literal one. In fact, the juxtaposition of the language "with stainless steel handles" in part 3E of schedule 6 of the tariff schedules with coordinate provisions for knives with handles composed of other, specifically designated materials, indicates to the contrary. Thus, under the inferior heading "knives with their handles" there are five (5) subdivisions of knives with handles, grouped according to the specific material of which the handle is composed, followed by a sixth or residual grouping designated only as "other." Such arrangement indicates, in our opinion, that Congress intended to classify "knives with their handles" according to the single, specific material of which the handles were composed, or if not so made, then under a residual category. [465 F.2d page 924, 59 CCPA, pages 210–211.]

The Court of Customs and Patent Appeals added:

* * * Considering the phrase "a stainless steel handle" in the context of com-

**910**

mon, everyday speech, we think that a person hearing the phrase would take it to mean that the handle is composed solely of the named material except, perhaps, for insignificant or negligible quantities of other materials, and would not expect to find substantial portions of other materials. The interpretations proposed by the Government, "in chief value of" and "predominantly," admit of significant amounts of other materials and do not comport with what we agree with the Customs Court to be a "literal construction" of the phrase. * * * [465 F.2d, page 925, 59 CCPA, page 211.]

Applying the same analysis, the knives here may not be classified as knives with stag or wood handles because of the presence of the metal pommel and guard.

A second case which supports the defendant's classification is *National Carloading Corp. v. United States*, 46 Cust.Ct. 1, C.D. 2224 (1961), *aff'd on rehearing*, 54 Cust.Ct. 178, C.D. 2529 (1965). According to the Court, "the sole question presented for our determination is whether the length of the knives, exclusive of the handles, is under 4 inches." 46 Cust.Ct., page 2. This, in turn, raised the question of whether the knives' bolsters or guards were part of their handles.

In *National Carloading* reliance was placed on an expert who testified: "The design of this handle ends in what we call in our trade, a bolster." He also stated that where "the blade portion ends, that is where the handle starts." *Id.*, page 3. In addition, the Court relied upon three different dictionary definitions. Judge Lawrence concluded for the Court: These definitions clearly indicate that a blade is the cutting portion of a knife, the other portion being described as the handle." *Id.*, page 4.

 Finally, plaintiff claims in the alternative that prior Customs practice existed which classified knives, such as those imported here, as wood-handled or stag-handled knives. This assertion in plaintiff's brief is offered without any support. No evidence was introduced at the trial as to earlier Customs practice. *Ditbro Pearl Co.,*

*Inc. v. United States*, 393 F.Supp. 1398, 72 Cust.Ct. 1, 8, C.D. 4497 (1974), *aff'd*, 515 F.2d 1157, 62 CCPA 95, C.A.D. 1152 (1975). All that exists in the record is some unsupported comments by plaintiff's counsel. Such opinions are not evidence. *Tropi-Cal v. United States*, 63 Cust.Ct. 518, C.D. 3945 (1969). In any case, there has been no showing of an established uniform practice within the meaning of 19 U.S.C. § 1315(d).

Plaintiffs in this Court bear a burden of proof to demonstrate the incorrectness of the Customs Service's classification and to establish the propriety of their asserted classification, whether primary or alternative. *United States v. New York Merchandise Co., Inc.*, 435 F.2d 1315, 58 CCPA 53, C.A.D. 1004 (1970). Plaintiff has failed to meet that burden here.

Action dismissed. Judgment will be entered accordingly.